**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE**


| | | |
|---|---|---|
| **JAMES ANDREWS,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 3:06-CV-42** |
| | ) | **(Phillips)** |
| **LOCKHEED MARTIN ENERGY SYSTEMS, INC.,** | ) | |
| **and BWXT Y-12, L.L.C.,** | ) | |
| **Defendants.** | ) | |


## <u>MEMORANDUM OPINION</u>


Plaintiff James Andrews has sued his former employers, Lockheed Martin Energy Systems, Inc. (LMES) and BWXT Y-12, L.L.C. (BWXT), alleging systemic racial discrimination in employment through discriminatory selection, promotion, compensation, and disciplinary policies, practices and procedures, discriminatory terms and conditions of employment, and the existence and perpetuation of a racially hostile work environment in violation of 42 U.S.C. § 2000e, *et seq.,* (Title VII) and 42 U.S.C. § 1981 as amended. Defendants LMES and BWXT have moved for summary judgment asserting that there are no genuine issues as to material facts, and that they are entitled to judgment as a matter of law on all of plaintiff's claims. For the reasons which follow, defendants' motion for summary judgment will be granted, and this action will be dismissed.

**Factual Background**

Beginning April 1, 1984, pursuant to a contract with the Department of Energy, LMES managed, operated and maintained the Y-12 facility in Oak Ridge, Tennessee. LMES' contract for operating the Y-12 facility ended on October 31, 2000, and BWXT assumed management and operation on November 1, 2000.

Andrews, an African-American male, was employed by LMES and the predecessor government contractors at Y-12 from 1978 until October 31, 2000. Beginning November 1, 2000, Andrews worked at BWXT until he terminated his employment by going on long-term disability on January 29, 2002.

Andrews began his Y-12 career as a building services employee, a position he held for about eleven months. He successfully bid on a material handler position and worked in that capacity from March 1979 until October 1987. He then bid upon and became a material clerk, the position he held until he terminated his employment by going on long term disability.

When Andrews started as a material handler, he joined the International Brotherhood of Teamsters, Local 519. He remained an active member of Local 519 until he resigned his membership in either the late 1980s or early 1990s. His resignation from Local 519 related to a dispute that did not involve race. Even after his resignation, Local 519 periodically handled grievances for Andrews.

During Andrews' employment at Y-12, the terms and conditions of his employment were governed by contracts between the respective government contractors and the Atomic Trades and Labor Council (ATLC). The contracts between the government contractors and the ATLC governed the rate of pay for material handlers and material clerks. Those contracts also contained provisions prohibiting racial discrimination.

Neither LMES nor BWXT ever took any disciplinary action against Andrews. Andrews could not recall even receiving informal counseling for unsatisfactory job performance at Y-12.

EEO/AA Policies

At LMES/BWXT, employment was subject to the company's Equal Employment Opportunity/Affirmative Action (EEO/AA) policy. The policy prohibits discrimination based on race, religion, color, sex, national origin and age. The policy covered recruitment and employment, promotion, demotion, transfer, layoff and termination, and other working conditions, including maintenance of a work environment free of physical, psychological, and verbal harassment on the basis of age, sex, ancestry, color, disability, national origin, race/ethnicity, religion/creed, or veteran status. An Employee Concern Response Program (ECRP) was also promulgated in the LMES Employee Handbook. The ECRP encouraged employees to report concerns about EEO/AA matters to their direct manager or the next appropriate level of management. Concerns could be reported orally or in writing. Other avenues for reporting concerns included the

bargaining unit, Safety and Health representatives, the Y-12 Safety Work Action Team, and the I Care - We Care Program.

Hostile Environment

Andrews claims that he was subjected to a hostile work environment during his employment at LMES and BWXT. Andrews testified that he did not hear any LMES managers or employees use racially insensitive language in his presence. Similarly, Andrews did not hear any racial slurs or epithets directed toward him while he was a BWXT employee. When asked what he meant by "racially hostile work environment," Andrews stated:

> As I said, we do a lot of classified work, and Jim, well, Jim Rose used to actually, he used to follow me and this other African-American when we eat or where we go, what kind of work are we doing, and he didn't seem to follow no other people, you know.
>
> And when you are dealing with chemicals and dangerous stuff, it is hard to - well, for me, I get a little nervous when people looking over your shoulder, sneaking around. It makes me uncomfortable, you know. And then, you know, he makes little comments and stuff, you know, so -
>
> What kind of comments?
>
> Like, What are you doing or Why do you do this? And I said, well you know, I do it - you know, I think I do it the safe way, the best way that I know how, you know. And I said, you know, I said, you know, I hadn't had any accident or hadn't had no complaints, you know.
>
> Why are you doing this for certain folks or why are you doing this? I said, Well, you know - And, as I said, sometime he accused us of hiding and doing all of this kind of stuff. And it is - I mean, it is just stuff, because he -

. . .

And he might call us back and tell the dispatcher, Well, he is sitting so and so, see if you can find something for him to do. What are you doing sitting back here? What are you doing sitting up here? I mean, he is always complaining about something, you know.

And then when you do something, you know, he just - he just agitates us, you know. And it - you know, when people are sneaking around, it makes me feel uncomfortable, you know, it just makes me feel uncomfortable.

Jim Rose was Andrews' direct supervisor from April 1995 until Rose retired on October 31, 1999. Rose was responsible for ensuring that materials were packaged and delivered in accordance with internal customers' requirements. Part of Rose's responsibilities required him to ensure that his subordinates were performing their jobs. When he was unable to locate a subordinate or the subordinate failed to answer radio dispatches, Rose often searched Y-12 to find that employee. Rose had a direct management style that occasionally included blunt criticism and directing idle employees to perform productive work. Rose was blunt to employees without regard to race.

From April 1995 until January 29, 2002, Andrews worked as a materials clerk in Y-12's west end. The west end is a protected area where many of the facility's most sensitive buildings and materials were located. Andrews' work assignments required him to drive a truck to pick and deliver classified and non-classified materials throughout Y-12. Some of the materials that Andrews transported were hazardous.

Work assignments for material clerks and material handlers were generally made by the shift dispatcher, although the front-line supervisor had such authority as well. Janet Eskridge, an African-American, was the dispatcher on most of the shifts that Andrews worked and, therefore, was responsible for most of his assignments. Eskridge maintained a log in which she recorded information relating to job assignments for individuals reporting to Rose, including Andrews.

On June 17, 1999, Rose witnessed Andrews and a white employee talking during their shift as Rose drove past them in a truck. Rose returned later and observed Andrews and the white individual still talking. Rose pointed his finger at the men and said, "Boys, you don't want to get on my list" or words similar to that effect. This was the only incident where Rose used language that Andrews thought was objectionable.

On June 18, 1999, Andrews complained to Doug Woodall about the statement made by Rose, and Woodall brought the incident to Steve Buffalo's attention. Buffalo was a general supervisor, and was Rose's direct supervisor. Buffalo and Woodall subsequently met with Andrews and John Ward, who Andrews asked to attend the meeting, to investigate the complaint. During the meeting, Andrews stated that he had been talking to a co-worker, Tom Minga, when Rose approached them in the truck. Andrews said that Rose asked him why he did not answer his "damn" radio, and that Eskridge, the dispatcher, had attempted to each Andrews without any success. Andrews then told Buffalo that he had not heard Eskridge's dispatches. According to Andrews, Rose

subsequently stated "Boy, you don't want to get on my list," and pointed his finger at him. Andrews complained to Buffalo that he felt threatened by Rose's remark and gesture.

On June 22, Buffalo met with Rose to investigate Andrews' complaint. Dave Bryant, who supervised Woodall, was also present. Rose admitted, during this meeting, that he had used the term "boy," but denied that the comment was racially motivated. He explained that it was not unusual for him to use the expression "boy" when addressing employees who were younger than him, regardless of race. Rose said that he would apologize to Andrews and Bryant counseled Rose for making the inappropriate comment.

Buffalo and Rose met with Andrews later that same day. Ward also attended the meeting at Andrews' request. Rose apologized to Andrews for using the word "boy." Buffalo explained to Rose and Andrews that Rose needed to be more tactful with his choice of words. Buffalo further suggested to Rose that he allow Eskridge to dispatch vehicle assignments, including assignments given to Andrews, to avoid future problems. Finally, Buffalo advised Andrews to report to him any additional problems with Rose. Rose and Andrews subsequently shook hands and Buffalo left the meeting believing the issue had been resolved to Andrews' satisfaction.

Rose remained Andrews' supervisor until Rose retired on October 31, 1999. Andrews considered the incident with Rose to be the worst experience he had with a supervisor at Y-12. Andrews did not have any additional problems with Rose after this incident.

On July 21, 1999, Andrews expressed an internal concern with Gail Sewell, who worked as an EEO Compliance Officer, about the nature and volume of work assignments given to him. Andrews claimed that he had been assigned more difficult work, more frequently, since he complained to Buffalo about Rose's comment to him. Andrews also complained to Sewell that Rose followed him at work on January 14; that Rose had assigned him work after observing him sitting with another employee on February 2; that he was not paid for work he performed on March 29; and that he believed he was assigned "make work" on June 17. Andrews also advised Sewell about the June 17 incident where Rose had called him "boy," but because Andrews advised Sewell that this incident had been resolved satisfactorily with Rose's apology and hand shake, Sewell did not investigate this matter further. Sewell conducted an investigation into Andrews' other allegations.

Sewell's investigation consisted of interviews with Andrews, Buffalo, Eskridge, Bryant, Woodall, Lisa Bowie, and a truck driver. She also reviewed the M&P log sheet and tickets which identified the job assignments for the relevant period. As part of the investigation, Eskridge also conducted an audit of the M&P log sheets and tickets covering the relevant period, which Sewell reviewed as well.

Sewell's investigation determined that Andrews' complaints lacked merit. The M&P log sheets and tickets revealed that Andrews' work assignments were comparable to similarly-situated drivers. Moreover, Sewell's investigation found that Eskridge, as the dispatcher, was primarily responsible for making work assignments to Andrews during the relevant period, and that she did so without regard to his race. Andrews has made no

allegations that Eskridge, an African-American, engaged in any inappropriate conduct based upon his race. Sewell concluded that Rose, as Andrews' supervisor, had authority to ascertain Andrews' whereabouts, determine whether Andrews was working and, if necessary, give him job assignments. Similarly, Sewell determined that Rose's supervision style was employed without regard to race. Andrews seemed satisfied with Sewell's investigation and explanation to him during their meeting at the conclusion of the investigation. Andrews did not exercise his grievance rights under the ATLC contract with regard to the complaints he made to Sewell.

Buffalo's Case Review Request

On July 18, 2000, Buffalo asked LMES' Medical Department to conduct a medical case review to determine whether Andrews was capable of safely performing his job. Buffalo became concerned about Andrews' fitness for duty after two meetings on July 12. The first meeting involved Buffalo, Andrews, and Brenda Milligan, who supervised Andrews at the time. The meeting was precipitated by an incident the day before where Andrews had run into a yellow pole with a forklift. Andrews did not report the incident to Milligan because he mistakenly believed that Milligan, who was working in the area, had witnessed the accident. Buffalo described the meeting as "very low key," focusing on how the incident had occurred and the reason that it was not reported to Milligan. Buffalo and Milligan were satisfied with Andrews' explanation, and no discipline was given to him.

Later that same day, Andrews met with Buffalo, Milligan and Fred Weaver to discuss another situation that occurred the previous day. This meeting related to a

dispatch from Eskridge that Andrews had received at 12:00 p.m., following a work assignment given to him at 10:00 a.m. When Andrews received the dispatch, he had not yet started the work assignment given to him two hours earlier. Milligan questioned Andrews as to why had not started the assignment. During his meeting with Buffalo and Milligan, Andrews complained that his intelligence had been insulted by Milligan questioning him. Buffalo explained to Andrews that management had a right to question Andrews about his job.

Two days later, on July 14, Andrews reported to LMES' Medical Department with complaints of chest pain and reported a confrontation with an acting supervisor. Andrews was excused from work and directed to visit his primary care physician. Andrews returned to the Medical Department on July 18 with similar complaints, and he was allowed to remain off work until July 21.

Buffalo became concerned about Andrews' fitness for duty after Dr. Barnes forwarded Andrews' medical restrictions to him. The work restrictions stated that Andrews had told Dr. Barnes that he had been in a "confrontation" with his supervisor. Buffalo had concerns about Andrews' fitness for duty given the fact that Andrews believed the meetings between Buffalo, Milligan, and Andrews were confrontational. Buffalo's request for a case review stated:

> This employee appears to get extremely upset anytime his supervisor asks any questions with respect to his job. . . .
>
> If this person is this easily upset, then I have a concern with him working in a protected area of the plant and with him

handling and working around hazardous materials and equipment.

The case review was conducted on August 16, 2000 to determine whether Andrews should continue working in Y-12's west end. The meeting was attended by Dave Wehrly, M.D., the former Director of LMES' Medical Department; Joyce Conner, Diversity Department Representative; Olga Henley, Labor Relations Representative; Howard Friedman, Ph.D., Y-12 Psychologist; Mary Radford, Disabilities Services Supervisor; Lisa Bowie, Manager, Material Control Organization; and Buffalo. At the conclusion of the meeting, Henley directed Andrews to report to Dr. Friedman for a psychological evaluation. Although Andrews met with Friedman once or twice, he failed to attend several appointments that had been scheduled. No adverse action was taken against Andrews because of the missed appointments, and Andrews was allowed to return to work.

Dept. of Transportation License Requirements

Andrews' position at LMES required him to have a Dept. of Transportation Commercial Driver's License (CDL) to operate commercial vehicles within Y-12. The Federal Motor Carrier Safety Regulations required vehicle operators with a CDL to satisfy certain medical standards. LMES' medical Department served as the DOT medical examiner for Y-12 employees with a CDL, and it was responsible for ensuring that employees operating vehicles requiring a CDL were able to comply with the governing regulations.

Andrews was absent from work for a non-occupational illness from September 13, 2000 until September 26, 2000. When he returned, he reported to LMES' Medical Department, seeking to be cleared to return to work. During the examination, Andrews revealed that he had experienced chest discomfort with some dizziness and ataxia, and he had an abnormal myocardial profusion study while absent from work. LMES' Medical Department requested Andrews' personal physician to provide medical records relevant to the question of whether Andrews could operate a commercial vehicle in light of these symptoms. Pending receipt of the requested medical records, the Medical Department placed a temporary restriction on Andrews, preventing him from operating commercial motor vehicles requiring a CDL because of safety concerns. Andrews' temporary work restrictions did not prevent him from working, or even driving a truck. He was only prohibited from operating trucks requiring a CDL. Moreover, the work restrictions did not adversely affect Andrews' compensation and benefits.

The ATLC filed a grievance on Andrews' behalf concerning these work restrictions. Andrews argued that the temporary restrictions violated LMES' contract with the ATLC because his personal physician had authorized him to return to work. LMES responded that LMES' Medical Department served as the DOT medical examiner for Y-12 employees with a CDL, and LMES had not been provided the necessary records to ascertain whether Andrews could comply with DOT regulations. The grievance was denied during the first three steps of the grievance process. Andrews subsequently appealed the adverse grievance decision to arbitration.

Andrews was absent from work for a non-occupational illness from October 31, 2000 until November 27, 2000. As before, Andrews visited the Medical Department upon his return, and Dr. Wehrly determined that Andrews' previous temporary work restrictions should remain in effect. Andrews was allowed to return to work, but was restricted from driving trucks requiring a CDL. Again, Dr. Wehrly requested Andrews' personal physician to provide medical records relevant to the determination as to whether Andrews had complied with the governing federal regulations.

On January 3, 2001, Dr. Wehrly scheduled a Part I and Part II physical examination for Andrews to determine whether the temporary restrictions should continue. After the examination, Dr. Wehrly determined that Andrews could safely perform all of his job responsibilities and removed the temporary work restrictions on January 8, 2001. At that time, Andrews was then cleared to work without any restrictions, including operating a commercial vehicle requiring a CDL. Because the issue was resolved, the ATLC took no further action on the grievance.

Threat Assessment Incident

On July 25, 2001, Herb Cunningham submitted a Workplace Violence Report to the Threat Assessment Team (TAT) that stated:

> I was verbally threatened with bodily harm from the M&P driver named above (Andrews). He threatened to "cut my gonads off."

Cunningham stated that the incident occurred on July 17, 2001.

The TAT responsible for Cunningham's complaint was staffed by Olga Henley, Labor Relations; Peter White, Safeguards and Security; and Russ Reynolds, Ph.D., Staff Psychologist. An investigation was conducted that consisted of interviews with Cunningham, Andrews, and Michael Napier, who supervised Andrews at the time. The investigation considered that Cunningham's one-week delay in reporting was "atypical for individuals experiencing an acute sense of threat." The investigation also noted that Cunningham had a history that sensitized him to be vigilant for signs of threat or intimidation by others. Moreover, Napier, during his interview, described Andrews as a "joker" and stated that making threats would be out of character for him. The investigation determined that while Andrews initially denied saying what was attributed to him by Cunningham, he later acknowledged that he "may have said it."

The TAT ultimately concluded that "whatever was actually said, while it was likely inappropriate, it does not appear that Mr. Andrews meant to threaten bodily harm to Mr. Cunningham." The TAT planned to conduct a face-to-face mediation between Cunningham and Andrews when Andrews returned to work. No such meeting ever occurred because Andrews did not return to work, and subsequently retired on long-term disability. No adverse employment action against Andrews was taken by BWXT as a result of Cunningham's charges or the subsequent investigation.

Failure to Promote

Defendants state that Andrews did not apply for a promotion after January 1, 1995, with either LMES or BWXT.

<u>EEOC Charge</u>

Andrews did not file a charge with either the Equal Employment Opportunity Commission (EEOC) or the Tennessee Human Rights Commission (THRC) concerning any of the complaints he now makes against LMES and BWXT.

LMES and BWXT have moved for summary judgment asserting that (1) Andrews cannot establish a *prima facie* case on either the racial discrimination or hostile work environment claims; (2) his failure to promote claim should be dismissed because he failed to apply for promotion while either LMES or BWXT managed the Y-12 facility; (3) his claim for unequal compensation and benefits should be dismissed because his rate of pay was governed by a union contract; and (4) Andrews' Title VII action is barred by the applicable statute of limitations because he failed to file a charge with either the Equal Employment Opportunity Commission or the Tennessee Human Rights Commission.

Plaintiff James Andrews has responded in opposition, stating that the evidence in this case demonstrates that he was subjected to a hostile work environment, discriminatory terms and conditions of employment, thus precluding summary judgment in favor of LMES and BWXT.

**<u>Standard of Review</u>**

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a

judgment as a matter of law." Fed.R.Civ.P. 56(c). In ruling on a motion for summary judgment, the court views the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). To withstand summary judgment, the non-movant must show sufficient evidence to create a genuine issue of material fact. *Klepper v. First Am. Bank,* 916 F.2d 337, 342 (6th Cir. 1990). A mere scintilla of evidence is insufficient; there must be evidence on which the jury could reasonably find for the non-movant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986). Entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).


## Analysis

### Hostile Work Environment Claim

Andrews claims that LMES and BWXT discriminated against him in two ways: by subjecting him to a hostile work environment, and by subjecting him to discriminatory selection and promotion practices, unequal terms and conditions of employment, and disparate treatment.


In the Sixth Circuit, claims under 42 U.S.C. § 1981 require the same standard of proof to establish a *prima facie* case as a Title VII claim. *Newman v. Federal Express Corp.,* 226 F.3d 401, 406 (6th Cir. 2001). Title VII prohibits racial harassment that creates a hostile or abusive workplace. *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21 (1993);

*Newman v. Federal Express Corp.,* 266 F.3d 401, 405 (6th Cir. 2001); *Hafford v. Seidner,* 183 F.3d 506, 512 (6th Cir. 1999).  Under Title VII, a plaintiff establishes a *prima facie* case of hostile work environment based on race by demonstrating the following five elements: (1) he was a member of a protected class; (2) he was subjected to unwelcomed racial harassment; (3) the harassment was based on race; (4) the harassment had the effect of unreasonably interfering with plaintiff's work performance by creating an intimidating, hostile, or offensive work environment; and (5) the employer was liable for the harassment. *Hafford,* 183 F.3d at 512.

A hostile work environment occurs "when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris,* 510 U.S. at 21.  In determining whether there was a hostile work environment, courts look to the "totality of the circumstances."  *Faragher v. City of Boca Raton,* 524 U.S. 775, 787-88 (1998).  "The conduct must be severe enough or pervasive enough to create an environment that a reasonable person would find hostile or abusive."  *Bowman v. Shawnee State Univ.,* 220 F.3d 456, 463 (6th Cir. 2000).  Appropriate factors for the court to consider when determining whether conduct is severe or pervasive enough to constitute a hostile work environment "include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Id.* quoting *Harris,* 510 U.S. at 23.  The Supreme Court has consistently held that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to

discriminatory changes in the terms and conditions of employment." *Newman,* 266 F.3d at 405, quoting *Faragher,* 524 U.S. at 788.

Andrews has not offered sufficient evidence to establish that he was subjected to a hostile work environment at either LMES or BWXT. During his deposition, Andrews testified that he did not hear a LMES manager or employee use racially insensitive language in his presence. Similarly, Andrews did not hear any racial slurs or epithets directed toward him while he was a BWXT employee. Andrews' only evidence of a racial remark is Rose's use of the word "boy" in 1999, but that is insufficient, standing alone to create a hostile work environment. The Sixth Circuit has determined that use of the word "boy," even by a supervisor, is not sufficiently severe and pervasive to create a hostile work environment. *See Ausler v. Pierce Hardy Real Estate, Inc.,* 1993 WL 533512 (6th Cir. Dec. 21, 1993) (no hostile environment when manager trainee called the African-American plaintiff "boy," and when the plaintiff objected, the manager trainee asked the plaintiff "if he preferred to be called nigger," because occasional or sporadic instances of offensive language do not establish a racially hostile work environment); *Ward v. Johnson,* 2000 WL 659354 (6th Cir. June 27, 2000) (no hostile work environment when co-employee said "good morning boys," or words to that effect, to two African-Americans, including the plaintiff); *Johnson v. Box USA Group, Inc.,* 208 F.Supp.2d 737, 743 (W.D.Ky. 2002) (no hostile work environment when co-employee, who was later promoted to supervisor, derogatorily referred to the African-American plaintiff as "boy" and repeated a racist joke in plaintiff's presence). Nor has Andrews submitted any evidence tending to show that Rose's remark was based on race. The record contains evidence that Rose used the

expression "boy" to address younger individuals with whom he worked, and the expression was not racially motivated. The court finds that Rose's isolated remark was not sufficiently extreme so as to adversely affect the terms and conditions of Andrews' employment.

Finally, Andrews has not provided evidence of employer liability for the alleged harassment. LMES and BWXT have submitted evidence that they implemented policies and procedures to create a workplace free from discrimination. Those policies were publicized in handbooks, newsletters and other publications, and distributed to all employees, including Andrews. Defendants thus provided each employee a way to express concerns and problems. Accordingly, defendants met the *Faragher* requirements for exercising reasonable care to prevent racial harassment, and implemented procedures to correct promptly any problems raised by concerned employees.

Andrews complained to Rose's supervisor about the remark. An investigation was conducted by Buffalo to determine whether Andrews' allegations had merit. Moreover, Buffalo and Bryant each counseled Rose for making the inappropriate comment. Rose apologized to Andrews and the two men shook hands, and Buffalo believed that the matter had been resolved to Andrews' satisfaction.

Andrews alleges that Buffalo, while serving as his supervisor, subjected him to racial harassment prior to 1995 that created a hostile work environment. Buffalo's alleged inappropriate comments included statements criticizing the quality of Andrews'

work; and remarks that Andrews wore nice clothes to work.  Even if true, conduct occurring prior to 1995 is clearly barred by the controlling limitations period.

Andrews also relates two incidents which occurred after 1996, when Buffalo moved to the west end and became Rose's direct supervisor .  Andrews states that if he expressed disagreement with a supervisor, Buffalo want "to know why."  Andrews also asserts that Buffalo "badgered" him by forbidding him from playing cards at Y-12 before his shift started.  However, accepting these allegations as true, there is no racial animus evidenced by Buffalo's conduct, nor is there any evidence that similarly-situated white employees were treated differently than Andrews.

Andrews also contends that he complained to Buffalo about other episodes where Rose harassed him and that Buffalo did not respond properly.  First, he complained about an incident on June 5, 1999, when Rose advised Andrews that he could not take a vacation day because a co-worker was already scheduled to be off that same day.  Rose subsequently advised Andrews that he could be off work on the day he requested; however, Andrews elected not to take the vacation day.  Andrews also complained that Rose searched for him on January 4, 1999, and Rose asked the dispatcher to assign him work on February 2, 1999, because Rose observed Andrews sitting in a parked vehicle.  Andrews also complained that he had been give more difficult work assignments since he complained about Rose's comment to him.  Finally, he complained about the denial of overtime for an offsite delivery; however, this was later resolved and Andrews has not made a claim for denial of overtime pay.

Andrews, when relaying his complaints to Buffalo, did not attribute his problems with Rose to his race. Rather, he stated that "Jim Rose agitates other people in the building and not just me." He later remarked that Rose "gets people on his list." Andrews' comments to Buffalo indicate that Rose was consistently abrasive to subordinates without regard to race.

Andrews also described Gail Sewell's investigation into his complaints as "flawed" and "not adequate." However, Sixth Circuit precedent does not "require that the decisional process used by the employer be optimal or that it left no stone unturned. Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action." *Smith v. Chrysler Corp.,* 155 F.3d 799, 807 (6th Cir. 1998). An investigation is sufficient if the employer "reasonably relied on the particularized facts that were before it at the time the decision was made." *Id.* The record shows that Sewell performed a timely and thorough investigation into the matters about which Andrews complained. She determined that Eskridge, an African-American who worked as the M&P dispatcher, was primarily responsible for making assignments to material handlers, including Andrews. There is no evidence offered by Andrews, apart from his subjective belief, suggesting that the assignments made by Eskridge and Rose were discriminatory. There is evidence to the contrary, however, showing that Sewell reviewed the log books maintained by Eskridge and she determined that Andrews was not treated differently than similarly-situated white peers.

Sewell also investigated Andrews' other complaints concerning Rose. She concluded that Rose, as Andrews' supervisor, had authority to ascertain Andrews' whereabouts, determine whether Andrews was working and, if necessary, give him job assignments. Sewell also determined that Rose's supervision style was employed without regard to race. Accordingly, the court finds that Andrews has failed to establish the necessary elements to a hostile environment claim, and defendants are entitled to summary judgment on this claim.

Racial Discrimination Claims

To establish a *prima facie* case of race discrimination, Andrews must show (1) he is a member of a protected class, (2) he was subjected to an adverse employment action, (3) he was qualified for the position, and (4) he was treated differently than similarly-situated employees for the same or similar conduct. *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 582-83 (6th Cir. 1992). To demonstrate an adverse employment action, Andrews must show a "materially adverse change in the terms and conditions of his employment. *Policastro v. Northwest Airlines*, 297 F.3d 535, 539 (6th Cir. 2002). A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, or other indices that might be unique to a particular situation. *Ford v. GMC,* 305 F.3d 545, 553 (6th Cir. 2002). A change in employment conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities. *Kocsis v. Multi-Care Mgmt, Inc.,* 97 F.3d 876, 886 (6th Cir. 1996). *De minimis* employment actions are not materially adverse

and, thus, not actionable.  *Bowman v. Shawnee State Univ.,* 220 F.3d 456, 461 (6th Cir. 2000).

Conduct that does not amount to a materially adverse employment action includes the following: close supervision, written warnings, reassignments without salary or work hour changes, and a one-day suspension with pay.  *See Johnson v. United Parcel Services, Inc.,* 2004 WL 3008776 (close supervision not an adverse employment action); *Williams*, 252 F.Supp.2d at 498 (written warnings did not constitute an adverse employment action); *Kocsis,* 97 F.3d at 885 (reassignments without salary or work hour changes are not adverse employment actions); *Rose v. Buckeye Telesystem, Inc.*, 181 F.Supp.2d 772, 777 (N.D.Ohio 2001) (one-day suspension with pay did not constitute an adverse employment action).

In order to meet the fourth element of his *prima facie* case, Andrews must show that there were non-minority employees who were treated better than he was and they were "similarly-situated in all respects."  *Mitchell,* 964 F.2d at 583.  To be deemed "similarly situated," the individuals with whom Andrews compares himself "must have dealt with the same supervisor,  been subject to the same standards, and engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it."  *Id., quoting Gray v. Tobisha Am. Consumer Products, Inc.,* 263 F.3d 595, 599 (6th Cir. 2001); *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 583 (6th Cir. 1992).

In his response to defendants' summary judgment motions, Andrews abandons his failure to promote claims, unequal compensation claims, and race discrimination claim related to the handling of a complaint of an alleged threat filed by Herb Cunningham. Andrews now claims disparate treatment in connection with three incidents that occurred from 1999 through July 2001: (1) Buffalo's medical case review request; (2) Rose's close supervision; and (3) Y-12 Medical Department's decision not to allow Andrews to operate vehicles requiring a CDL license until it received relevant medical records.

First, the court finds that Buffalo's request for a medical case review following Andrews' accident with the forklift does not constitute an adverse employment action. Buffalo's request was reasonable and appropriate under the circumstances. Andrews worked in a protected area of the Y-12 facility and was responsible for transporting hazardous and classified materials. At most, Buffalo's request is a *de minimis* action that is not actionable under Title VII. Moreover, Andrews has proffered no evidence that he was treated differently than similarly-situated, non-minority employees under Buffalo's supervision. In fact, Buffalo testified that he had requested medical case reviews on white employees under his supervision. There is no indication in the evidence submitted that race was a consideration in Buffalo's decision to request a medical case review. Nor is there any evidence that the terms and conditions of Andrews' employment changed as a result of the request for a medical case review.

Second, the court finds that Andrews' disparate treatment claim regarding Rose's close supervision does not constitute an adverse employment action. *See Johnson*

*v. United Parcel Services, Inc.,* 2004 WL 3008776 ("close supervision . . . does not meet the definition of an adverse employment action").  Nor has Andrews shown that he was supervised differently than similarly-situated, non-minority employees.  The record indicates that Rose's close management style was used without regard to race.

Third, the court finds that the work restrictions imposed by the Medical Department did not amount to an adverse employment action.  They merely prevented Andrews from operating a vehicle that required a CDL.  They did not affect his compensation or benefits, nor did they prohibit him from driving vehicles that did not require a CDL.  Andrews' work restrictions essentially amounted to no more than a job reassignment, not an adverse employment action.  *See Kocsis,* 97 F.3d at 885 ("Reassignments without salary or work hour changes do not ordinarily constitute adverse employment decisions").  There is also no evidence in the record that Andrews was treated differently than similarly-situated, white employees.

Defendants have submitted evidence that the work restrictions were necessary under the circumstances.  The Y-12 Medical Department served as the DOT Medical Examiner for Y-12 employees with a CDL, and it was responsible for ensuring that employees operating vehicles requiring a CDL within Y-12 were able to comply with the governing regulations.  The Medical Department imposed the restrictions after Andrews was absent from work for chest discomfort "with some dizziness and ataxia, and an abnormal myocardial profusion study."  Medical was concerned that Andrews's symptoms constituted a hazard and prevented him from operating a vehicle requiring a CDL under the

applicable federal regulations.  The Medical Department made it clear to Andrews that it would lift the work restrictions if his personal physician supplied medical records to alleviate its concerns.  Andrews' personal physician did not respond, causing the work restrictions to remain in place.  As soon as the pertinent medical information was received, the restrictions were removed.  The work restrictions imposed by the Medical Department did not adversely affect Andrews' compensation and benefits.  Therefore, he did not suffer an adverse employment action.

Andrews argues that he suffered an adverse employment action when he was medically forced to stop working in August 2001, because the stress of race discrimination and harassment caused his blood pressure to rise uncontrollably leading directly to his medical disability.  However, the relationship between his health issues and his employment has not been established by medical proof.  Because Andrews has proffered no more than speculative statement and conclusory opinions regarding the relationship between his health issues and his employment, his claim is without merit.  Based on the record in this case, the court finds that Andrews has failed to establish the necessary elements to a disparate treatment claim, and defendants are entitled to summary judgment on this claim.

<u>Statute of Limitations</u>

Defendants next assert that Andrews' Title VII claims against them are barred because he failed to file a timely EEOC charge.  A plaintiff must file a timely charge of discrimination with the EEOC before filing a complaint in federal court.  *See* 42 U.S.C. §

2000e-5(e); *Davis v. Sodexho,* 157 F.3d 460, 463 (6th Cir. 1998). Andrews' last day of employment with LMES was October 31, 2000, and his lawsuit was filed on December 28, 2001. He did not file a charge with either the EEOC or the THRC prior to initiating this action. Because Andrews waited almost fourteen months from his last day of employment with LMES before filing suit, his Title VII claims against LMES are time barred. Similarly, Andrews never filed an EEOC/THRC charge against BWXT; therefore, his Title VII claims against BWXT are also barred.

Andrews attempts to save his untimely claims by relying upon charges filed by other plaintiffs against LMES under the single-filing rule, also known as "piggy backing." Where a "substantially related" claim arises out of the same time frame as the timely filed claim, the complainant need not satisfy Title VII's filing requirement to recover. *EEOC v. Wilson Metal Casket Co.,* 24 F.3d 836, 839-40 (6th Cir. 1994). A charge will be adequate to support piggy backing under the single filing rule if it contains sufficient information to notify prospective defendants of their potential liability and permit the EEOC to attempt informal conciliation of the claims before a lawsuit is filed. *Howlett v. Holiday Inns, Inc.,* 49 F.3d 189, 196 (6th Cir. 1995). The rule in the Sixth Circuit is that "the complaint and the judicial proceedings are limited not to the words of the EEOC charge but to the scope of the EEOC investigation reasonably expected to grow out of the charge of discrimination." *EEOC v. McCall Printing Co.,* 633 F.2d 1232, 1235 (6th Cir. 1980).

Andrews' attempt to piggy back with other plaintiffs who filed EEOC charges is unpersuasive for two reasons. First, Andrews offers no authority that supports allowing

him to piggy back under the facts of his case.  Second, his claim is wholly separate and distinguishable from the claims brought by the plaintiffs upon whom he would piggy back. Plaintiffs Moore, Clark, and Sheard[1], upon whom Andrews seeks to piggy back, all asserted racial discrimination and hostile environment claims, but their claims arose from alleged conduct and practices within the protective services department at Y-12.  The record shows that the protective services department is, and always has been, managed separately from the Weapon Material Management division where Andrews worked.  Andrews did not share supervision or duties with Moore, Clark or Sheard, nor was he exposed to related conduct.

Similarly, while plaintiffs Mynatt, Miller and Duff were not security guards, they too were not employed in the same area as Andrews.  None of Andrews' supervisors supervised them, consequently, nothing in their charges would have reasonably alerted the EEOC that it needed to investigate any alleged problems in Andrews' employment or attempt to conciliate any claims related to or arising from it.  Andrews points to no evidence that LMES, by virtue of the charges he would invoke, was placed on notice that discriminatory conduct had occurred anywhere near Andrews in the Y-12 plant.  Nor does Andrews show that the EEOC ever, based upon the charges he lists, discovered similar conduct or attempted conciliation of it.  Andrews' attempt to save his untimely claims by piggy backing fails as a matter of law.

---

[1] The claims of Moore, Clark, Sheard, Mynatt, Miller, Duff and Linson were originally brought in an action styled Paul Sheard v. Lockheed Martin Energy Systems, et al., Docket No. 3:01-cv-660.  By order entered February 2, 2006, the court approved the parties' agreement to sever the individual plaintiff's claims for trial.

Andrews did not file an EEOC charge against BWXT.  Instead, he argues that his Title VII claims against BWXT are viable because BWXT had notice of the charges other plaintiffs filed against LMES.  LMES and BWXT are wholly separate legal entities that cannot act as a surrogate for the other.  Andrews never filed a charge against BWXT for the discriminatory conduct that Andrews alleges BWXT committed.  The record does not show that the EEOC ever investigated any allegations against BWXT.  Thus, his failure to timely file an EEOC claim against BWXT bars his Title VII claims in this action.  *See, e.g., Ward v. Hickory House,* 2003 WL 21920027 (6th Cir. Aug 8, 2003) (affirming summary judgment and dismissing employer in Title VII case where the employer was not named in the EEOC charge and the EEOC never investigated any claims against it).  Accordingly, summary judgment will be granted to LMES and BWXT on Andrews' Title VII claims.

### Conclusion

For the reasons stated above, the court finds that defendants Lockheed Martin Energy Systems and BWXT are entitled to  judgment as a matter of law on Andrews' claims of discrimination under Title VII and 42 U.S.C. § 1981.  Accordingly, defendants' motion for summary judgment [Doc. 8] will be granted,  and this action will be dismissed.

**ENTER:**

_____s/ Thomas W. Phillips_____
United States District Judge

-29-